## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | NO. 11-078-03 |
| ILYA SIVCHUK | : | |
| | : | |

## Memorandum

YOHN, J.                                                                         June 12, 2012

A jury convicted defendant, Ilya Sivchuk, of making a false statement relating to health-care matters in violation of 18 U.S.C. § 1035(a)(2). He has filed a post-trial motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c), or alternatively, for a new trial under Federal Rule of Criminal Procedure 33. For the reasons discussed below, I will deny defendant's motion.

**I.      Background**

This case arose out of an investigation of the improper practices of Advantage Ambulance, a private ambulance company in Philadelphia. From mid-2003 to December 2009, Advantage Ambulance was owned by defendant's wife, Alla Sivchuk. Defendant, who served as the company's vice president, and Alla Sivchuk, who served as the president, were largely uninvolved in the daily operations of the business. The Sivchuks entrusted the management of

1

Advantage Ambulance to Ivan Tkach.[1] On September 30, 2004, the United States Department of Health and Human Services ("HHS") excluded Tkach from working as a Medicare program health-care-services provider for a minimum of five years following his conviction for misdemeanor offenses. Nevertheless, Tkach continued working in a management capacity at Advantage Ambulance during that five-year period.

In April 2007, Fox News aired an investigative report that disclosed improper practices at Advantage Ambulance.[2] As a result of the broadcast, the Federal Bureau of Investigation ("FBI") commenced a criminal investigation into Advantage Ambulance. Defendant's conviction stems from statements and representations he made to federal agents on July 7, 2010, during the course of that investigation.

On February 9, 2011, a grand jury indicted defendant on one count of making a false statement relating to health-care matters in violation of 18 U.S.C. § 1035(a)(2).[3] On May 11, 2011, a grand jury returned a superseding indictment that charged as follows:

> On or about July 7, 2010, in the Eastern District of Pennsylvania, defendant ILYA SIVCHUK, in any matter involving a health care benefit program, knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation, in connection with the delivery of or payment for health care benefits, items, or services, that is, defendant ILYA SIVCHUK stated to federal agents that defendant IVAN TKACH worked for Advantage as merely a shop mechanic, knowing full well that defendant IVAN

---

[1] Alla Sivchuk sold Advantage Ambulance in December 2009. The purchaser of the company retained many of its employees including, for a time, Ivan Tkach.

[2] In addition to disclosing Tkach's exclusion, the broadcast also focused on the company's provision of medically unnecessary ambulance services.

[3] The indictment also charged Alla Sivchuk and Ivan Tkach with thirteen counts relating to health-care fraud under 18 U.S.C. § 1347 and false statements relating to health care under 18 U.S.C. § 1035.

TKACH was the operational manager of the business for the duration of his employment there, whose duties included, among others, hiring and firing employees, handling patient complaints, resolving employee disputes, transporting patients, and billing Medicare.

In violation of Title 18, United States Code, Section 1035(a)(2).

Defendant's five-day jury trial was held in October and November 2011. At the close of the government's case, defendant moved for judgment of acquittal under Federal Rule of Criminal Procedure 29(a) and I reserved ruling in accordance with Rule 29(b). Defendant was found guilty by the jury on November 7, 2011, after which I denied defendant's motion for judgment of acquittal. Defendant filed the current motion for judgment of acquittal or a new trial on November 11, 2011, arguing that there was insufficient evidence for a reasonable jury to conclude beyond a reasonable doubt that (1) defendant made a false statement, (2) the false statement was material, and (3) the false statement was made in connection with the delivery of or payment for health-care benefits, items, or services. In the alternative, defendant urges me to grant a retrial in order to avoid a serious miscarriage of justice. The government filed its response on December 8, 2011, arguing that it presented ample evidence at trial to support the jury's finding of guilt. After transcripts of the trial became available, defendant submitted a brief in support of his motion on December 27, 2011.

Viewing the evidence in the light most favorable to the government, as I am required to do in evaluating defendant's motion for judgment of acquittal, I conclude that the evidence was sufficient for a reasonable jury to find beyond a reasonable doubt that defendant knowingly and willfully made a materially false representation in connection with the delivery of or payment for health-care benefits, items, or services. Exercising my own judgment in assessing the government's case, as I must in considering defendant's motion for a new trial, I find that the

verdict is not a serious miscarriage of justice. Thus, I will deny defendant's motion.

## II.   Discussion

### A.      Motion for Judgment of Acquittal

Defendant argues that there was insufficient evidence presented at trial to convict him of making a false statement relating to health-care matters in violation of 18 U.S.C. § 1035(a)(2). He therefore urges me to enter a judgment of acquittal pursuant to Rule 29(c).

#### i.      Standard

Rule 29(c) provides that a defendant may, within seven days after the verdict, or such longer time as the court may prescribe, file a motion for a judgment of acquittal. Fed. R. Crim. P. 29(c)(1). The purpose of Rule 29 is to question the sufficiency of the evidence to support a conviction. *See United States v. Cohen*, 301 F.3d 152, 156 (3d Cir. 2002). "A defendant challenging the sufficiency of the evidence bears a heavy burden." *United States v. Casper*, 956 F.2d 416, 421 (3d Cir. 1992). Furthermore, "[a] finding of insufficiency should be confined to cases where the prosecution's failure is clear." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (internal quotation marks and citations omitted).

In reviewing the record to determine whether there was sufficient evidence to support a conviction, "the court must view the evidence and the inferences logically deducible therefrom in the light most favorable to the government, to determine if there is sufficient evidence to support the factfinder's verdict." *United States v. McNeill*, 887 F.2d 448, 450 (3d Cir. 1989). Moreover, "the trial court's ruling on the sufficiency of the evidence is governed by strict principles of deference to a jury's findings." *United States v. Ashfield*, 735 F.2d 101, 106 (3d Cir. 1984*)*. "A verdict will be overruled only if no reasonable juror could accept the evidence as sufficient to

support the conclusion of the defendant's guilt beyond a reasonable doubt." *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987) (citations omitted); *see also United States v. Salmon*, 944 F.2d 1106, 1113 (3d Cir. 1991) (finding that in evaluating the sufficiency of the evidence to support a conviction, the court "must determine whether a reasonable jury believing the government's evidence could find beyond a reasonable doubt that the government proved all the elements of the offenses").

### ii.   Evidence at Trial

Defendant immigrated to the United States from Ukraine in 1990 with his wife, Alla.[4] (Trial Tr. 146, Nov. 3, 2011 ("Nov. 3 Tr.").) In the 1990s, defendant formed the Four Brothers Construction Company, which was very successful. (*Id.* at 147-48.) In 2002, he began looking to invest his earnings from the construction business in other business ventures. (*Id.* at 39-40, 148.) He was approached by Tkach, a member of his church and a longtime family friend, about investing in an ambulance company. (*Id.* at 149.) Defendant agreed, and Advantage Ambulance company was formed in 2003 as a corporation wholly owned by Alla Sivchuk. (*Id.* at 150.) Because the Sivchuks had no knowledge of the ambulance business, they relied on Tkach to run the day-to-day operations of the company. (*Id.* at 150.)

Advantage Ambulance primarily transported non-emergent Medicare patients, such as dialysis patients. In 2007, 2008, and 2009, Medicare paid Advantage Ambulance approximately $2 million per year. (Trial Tr. 27-28, Nov. 1, 2011, Doc. Number 114 ("Tr. 114").) During the period that Alla Sivchuk owned Advantage Ambulance, the company received $10.9 million in

---

[4] Both defendant and his wife are now U.S. citizens. (Trial Tr. 147, Nov. 3, 2011.) Although he is by no means fluent, defendant speaks English and made only limited use of an interpreter at trial. (*Id.*)

total billings from Medicare. (Nov. 3 Tr. at 36.)

Joann Francis, an investigations analyst with the HHS Office of Inspector General ("OIG"), Office of Investigation, Exclusions Staff, testified that beginning in 2001, HHS contacted Tkach to inform him that he was being excluded from being a Medicare-services provider as a consequence of his conviction for several misdemeanors, including recklessly endangering another person, in the Court of Common Pleas of Philadelphia County. (Trial Tr. 50-51, 56, Nov. 1, 2011, Doc. Number 108 ("Tr. 108").) Tkach's exclusion became final on September 30, 2004, and lasted for a period of five years from that date. (*Id*. at 54, 57.)

Francis testified that individuals excluded by HHS from being Medicare-services providers "cannot cause claims to be submitted to the program for any services that they furnish, order, or prescribe, directly or indirectly." (*Id*. at 49.) Francis explained that the exclusion prevented Tkach from driving an ambulance for Medicare patients, working as an emergency medical technician for Medicare patients, or directing other employees to transport Medicare patients. (*Id*. at 69, 79.) According to Francis, the exclusion did not prevent Advantage Ambulance from paying Tkach for mechanical work done to ambulances or work done in the office as long as the company did not bill Medicare for these services. (*Id*. at 70.)

Several employees of Advantage Ambulance, including James West, Alexandra Torres-Luna, John Austin, Troy Major, and Casey Mather,[5] testified as to Tkach's responsibilities at Advantage Ambulance during his period of exclusion. According to their testimony, Tkach was responsible for: (1) driving an ambulance and transporting patients on occasion (Tr. 114 at 72,

---

[5] After leaving her employment at Advantage Ambulance, Casey Mather was married and took Salas as her last name. I will refer to her by her maiden name because that is how most of witnesses at trial identified her.

132; Trial Tr. 18, 41, 52, Nov. 2, 2011 ("Nov. 2 Tr.")); (2) hiring and firing employees (Tr. 114 at 72, 129; Nov. 2 Tr. at 7, 34, 41); (3) billing Medicare and other providers (Tr. 114. at 72, 134; Nov. 2 Tr. at 56); (4) scheduling employees to transport Medicare patients (Tr. 114 at 72; Nov. 2 Tr. at 18, 36); (5) handling patient complaints (Tr. 114 at 133-34); (6) handling employee disputes and discipline (Tr. 114 at 133; Nov. 2 Tr. at 18, 43); (7) approving employee absences (Tr. 114 at 132; Nov. 2 Tr. at 22, 45); and (8) maintaining the ambulances (Tr. 114 at 72; Nov. 2 Tr. at 18, 36). Several witnesses characterized Tkach's position at Advantage Ambulance as that of a manager, general manager, or boss. (Tr. 114 at 72; Nov. 2 Tr. at 9, 36.) Additionally, several Advantage Ambulance documents in which Tkach identified himself as the manager were admitted into evidence. (Nov. 2 Tr. at 45, 49.)

According to these witnesses, the Fox News investigative report that aired in April 2007 precipitated some changes in Tkach's role at Advantage Ambulance. After the broadcast, Tkach was absent from the business for a period of approximately three to four weeks. (Nov. 2 Tr. at 95.) Before he returned to work, another employee of Advantage Ambulance, Casey Mather, was officially promoted to the position of general manager. (*Id*. at 89.) Mather testified that in her new role as manager, she would consult with Tkach daily and that Tkach remained her boss. (*Id*. at 95, 99.) Additionally, Tkach and Mather hired a new employee whom Tkach trained to take over Medicare billing. (*Id*. at 95, 214.) Mather testified that after April 2007, Tkach never transported another patient. (*Id*. at 132.)  And Troy Major testified that Tkach primarily fixed ambulances following the Fox News broadcast. (*Id*. at 20.) Nevertheless, Major told the jury that Tkach remained in charge in many ways. For example, Tkach still approved employee absences, resolved dispatch conflicts, and supervised the managers. (*Id*. at 20, 22.) Another Advantage

Ambulance employee testified that after April 2007, Tkach did more than fix trucks—he opened the business; made the employee schedule; hired, trained, and promoted employees; and completed important paperwork. (*Id*. at 226-30.)

In addition to precipitating changes at Advantage Ambulance, the Fox News broadcast attracted the attention of the FBI, which opened a criminal investigation into Advantage Ambulance in April 2007. (Nov. 3 Tr. at 49.)

On August 24, 2009, Tkach applied to HHS for reinstatement as a Medicare-services provider at the end of his exclusion period. (Tr. 108 at 60.) In his application, Tkach certified that he was a shop manager and mechanic for Advantage Ambulance and that he had not submitted claims or caused claims to be submitted for reimbursement from Medicare for services furnished, ordered, or prescribed by him during his period of exclusion. (*Id*.) In processing the application, Francis noted the ongoing criminal investigation, and the application was forwarded to the agents leading that investigation. (*Id*.; Nov. 3 Tr. at 38.)

On July 7, 2010, approximately six months after Alla Sivchuk sold Advantage Ambulance, Special Agent Peter Freda ("Agent Freda") of the HHS OIG and Special Agent Kimberly Cyganik ("Agent Cyganik") of the FBI interviewed Sivchuk at his home. (Nov. 3 Tr. at 5, 11, 52, 60.) According to Agent Freda's testimony, he and Agent Cyganik told defendant that the reason for their visit was that Tkach had recently applied for reinstatement as a health-care-services provider under Medicare and Medicaid. (*Id*. at 37-38.) Agent Freda testified that he was also "trying to find out the truth about who owned and operated Advantage Ambulance" as well as what criminal activity the Sivchuks might be engaged in. (*Id*. at 38, 51.)

Agent Freda testified that during the interview, defendant told him and Agent Cyganik

that Tkach had been hired to be a "mechanic and shop or garage manager." (*Id*. at 40.) According

to Agent Freda's account, Sivchuk told the agents that he and his wife "relied heavily on [Tkach]

because they did not have the knowledge to run an ambulance company" but that Tkach had "a

very limited role, other than to make sure that the vehicles were maintained and operating

properly." (*Id*. at 41, 59.) Agent Freda testified that defendant told the agents that Tkach was not

involved in marketing Advantage Ambulance and that he had access to company accounts only

in order to pay for tires, oil, and automobile repairs. (*Id*. at 93.)

On cross-examination, Agent Freda conceded that defendant did not use the phrase

"merely a mechanic" to describe Tkach's role at Advantage Ambulance, but rather described

Tkach as a "shop manager and mechanic." (*Id*. at 61, 63.) According to his testimony, even

though the defendant told him that he did not "know anything about the ambulance company," he

still correctly identified Casey Mather and Claudia Avila as managers. (*Id*. at 61.) Agent Freda

also admitted that during the July 7, 2010, interview he never asked defendant whether Tkach

was responsible for hiring and firing, handling patient complaints, resolving employee disputes,

transporting patients, or billing Medicare. (*Id*. at 96-97.)

Agent Cyganik testified that during the July 7, 2010, interview, defendant described

Tkach as a "mechanic, or shop mechanic." (*Id*. at 115.) She testified that defendant told her and

Agent Freda that Tkach's "duties were to fix ambulances, manage the garage, and maintenance

within the garage." (*Id*. at 115-16.) According to Agent Cyganik, she and Agent Freda asked

defendant whether Tkach was the manager who ran the day-to-day operations and defendant

responded that he was the garage manager, not the manager. (*Id*. at 122.)

Defendant testified that he had little knowledge of the daily operations of Advantage

9

Ambulance because his construction business was his full-time job, often involving 18-hour days. (*Id*. at 155.) For example, defendant told the jury that he did not know who was responsible for hiring and firing employees. (*Id*. at 165.) According to his testimony, defendant viewed Advantage Ambulance only as an investment and viewed his role as supplying funds to the company at Tkach's request.[6] (*Id*. at 155, 162.)

Defendant testified that he answered the agents' questions honestly and to the best of his ability during the July 7, 2010, interview. (Trial Tr. 16, Nov. 4, 2011 ("Nov. 4 Tr.").) He testified that it was his understanding that Tkach's title at Advantage Ambulance was "garage manager." (Nov. 3 Tr. at 169.) He described Tkach as serving primarily as his translator at Advantage Ambulance and as his advisor.[7] (*Id*. at 165.) According to his testimony, defendant understood that there were other "managers" at Advantage Ambulance, namely, Casey Mather and Claudia Avila. (*Id*. at 170.) He testified that he understood the term "manager" to denote an employee in charge of the daily operations of a business. (*Id*. at 165.) But he also testified that he did not understand the term "management team" at the time of his arrest. (Nov. 4 Tr. at 18-19.) Defendant acknowledged that even after Casey Mather was promoted to manager following the Fox News report, she still reported to Tkach and Tkach retained the authority to fire her or demote her. (*Id*. at 17.)

_____

[6] Defendant testified at trial that he did not know of Tkach's criminal record when he established Advantage Ambulance in 2002, but was aware of "rumors [going] around in my church about that." (Nov. 3 Tr. at 157.) According to defendant's testimony, he first became aware of Tkach's exclusion when he was approached by Fox News in 2007. (*Id*. at 158-59.) Defendant testified that after the broadcast he contacted an attorney, who explained that Tkach could work in the garage but could not transport Medicare patients in an ambulance. (*Id*. at 160.)

[7] However, defendant told the FBI on February 10, 2011, that Tkach acted as a business advisor, shop manager, garage manager, and drove the ambulance occasionally. (*Id*. at 99, 104.)

### iii.    Analysis

Defendant contends that a reasonable jury could not find that the government proved all of the elements of the offense of making a false statement relating to health-care matters in violation of 18 U.S.C. § 1035(a)(2). The statute provides,

> (a) Whoever, in any matter involving a health care benefit program, knowingly and willfully—
>     . . . .
>         (2) makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry,
> in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 5 years, or both.

18 U.S.C. § 1035(a)(2). In particular, defendant argues that the government failed to prove (1) that he made a false statement, (2) that the false statement was material, and (3) that the false statement was made in connection with the delivery or payment for health-care benefits, items, or services.

### a.    False Statement

The superseding indictment charged defendant with making a false statement when he "stated to federal agents that . . . [Tkach] worked for Advantage as merely a shop mechanic, knowing full well that . . . [Tkach] was the operational manager of the business for the duration of his employment there, whose duties included, among others, hiring and firing employees, handling patient complaints, resolving employee disputes, transporting patients, and billing Medicare."

11

Defendant disputes the jury's finding that he made a false statement. First, defendant argues that the evidence established that he never described Tkach as "merely" a mechanic, and that the superseding indictment was "to put in mildly, 'inaccurate' where it alleged that" he did. (Mem. of Law of Def. for J. of Acquittal and Mot. for New Trial ("Def.'s Mem.") at 5.)  Second, defendant emphasizes that Agent Freda conceded on cross-examination that he never asked defendant whether Tkach was responsible for "hiring and firing employees, handling patient complaints, resolving employee disputes, transporting patients, and billing Medicare" during his employment with Advantage Ambulance. And finally, defendant asserts that "[e]ven [if he] inaccurately described Tkach's role . . . there is no evidence that . . . [he] was aware of what Mr. Tkach was doing other than 'running' the business." (*Id.* at 5-6.)

Contrary to defendant's contentions, the government presented ample evidence that defendant made a false statement. Numerous government witnesses testified that Tkach was the operational manager of Advantage Ambulance (Tr. 114 at 72; Nov. 2 Tr. at 9, 36), and responsible for (1) driving an ambulance and transporting patients on occasion (Tr. 114 at 72, 132; Nov. 2 Tr. at 18, 41, 52); (2) hiring and firing employees (Tr. 114 at 72, 129; Nov. 2 Tr. at 7, 34, 41); (3) billing Medicare and other providers (Tr. 114. at 72, 134; Nov. 2 Tr. at 56); (4) scheduling employees to transport Medicare patients (Tr. 114 at 72; Nov. 2 Tr. at 18, 36); (5) handling patient complaints (Tr. 114 at 133-34); (6) handling employee disputes and

discipline (Tr. 114 at 133; Nov. 2 Tr. at 18, 43); (7) approving employee absences (Tr. 114 at

132; Nov. 2 Tr. at 22, 45); and (8) maintaining the ambulances (Tr. 114 at 72; Nov. 2 Tr. at 18,

36).[8]

Furthermore, the jury could reasonably infer from the evidence presented at trial that

defendant was aware of Tkach's role at Advantage Ambulance. For example, Mather testified

that in March 2007 defendant attended a meeting at Advantage Ambulance where Tkach's

position and duties at the company were discussed at length. (Nov. 2 Tr. at 77-78.) The meeting

was convened in response to the ongoing Fox News investigation, and defendant participated in

the conversation about Tkach's exclusion and his role at Advantage Ambulance. (*Id*. at 78-79.)

According to Mather, at the meeting defendant acknowledged that he was aware of Tkach's

exclusion and said "that we needed to fix the problem." (*Id*. at 82-83.) Furthermore, she testified

that defendant participated in crafting untrue answers to the reporter's questions, including

characterizing Tkach as a "garage manager and mechanic . . . [whose] sole role was to keep all

mechanical situations in order." (*Id*. at 84-86.) After delivering these lies during her interview

with Fox News, Mather was promoted to manager, given a $3-per-hour raise, and a $250 bonus.

(*Id*. at 88-89.) A reasonable juror could infer from this testimony that defendant was aware of the

---

[8] Defendant also notes that the agents did not ask him to "distinguish between Mr. Tkach's role over time. . . . [which] [c]learly . . . changed after April 2007 when the Fox News report aired." (Def.'s Mem. at 5.) Insofar as defendant is arguing that his description of Tkach's role at Advantage Ambulance in the July 7, 2010, interview was an accurate characterization of Tkach's role at Advantage Ambulance after the broadcast, there was ample evidence for the jury to conclude otherwise. (Nov. 2 Tr. at 95, 99, 214 (Mather testifying that as manager Tkach remained her boss, that Tkach remained in charge of hiring); *Id*. at 20, 22 (Major testifying that Tkach still approved employee absences, resolved dispatch conflicts, and supervised the managers); *Id*. at 226-30 (Avila testifying that Tkach opened the business, made the employee schedule, hired, trained, and promoted employees, and completed important paperwork.)

nature of Tkach's employment at Advantage Ambulance and had motive to lie about it.

Finally, although Agent Freda testified that defendant did not use the phrase "merely a mechanic" (Nov. 3 Tr. at 61), he also testified that defendant described Tkach as a "shop manager and mechanic" (*id*. at 63) who had "a very limited role, other than to make sure that the vehicles were maintained and operating properly" (*id*. at 41, 59). Furthermore, Agent Cyganik testified that defendant told the agents that Tkach's "duties were to fix ambulances, manage the garage, and maintenance within the garage." (*Id*. at 115-16.) She testified that when asked whether Tkach was the manager who ran the day-to-day operations, defendant responded that he was *not* the manager but the garage manager. (*Id*. at 122.)

Thus, viewing the evidence and the logical inferences in the light most favorable to the government, as I must with respect to defendant's Rule 29(c) motion, I conclude that there is sufficient evidence to support the jury's finding that defendant made a false statement.

### b.    Materiality

Next, defendant challenges the jury's finding of materiality. The parties appear to agree that *United States v. Gaudin*, 515 U.S. 506 (1995), establishes the standard that governs the materiality determination here. In general, a false statement is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Id*. at 509. The Third Circuit has clarified that the statement need not actually be relied on by the decisionmaking body, but need only be "of a type that one would normally predict would influence the given decisionmaking body." *United States v. McBane*, 433

F.3d 344, 351 (3d Cir. 2005).[9]

Defendant argues that his statement "describing Tkach as the garage or shop manager . . . even if it was false, could not have influenced any decision-making body." (Def.'s Mem. at 7.) Defendant argues that his falsehood must be "material to the delivery of or payment for federal healthcare services." (*Id*. at 8.) Thus he concludes that his statements were completely immaterial to HHS because "the Sivchuks had no further legal or financial interest in Advantage Ambulance in July 2010." (*Id*. at 8.)

As a preliminary matter, I reject defendant's interpretation of the materiality requirement. Defendant's reading of the statute collapses two elements of section 1035 into one and essentially creates a causation requirement where none exists.  The plain language and the structure of the statute belie defendant's construction. The statute reads:

> (a) Whoever, in any matter involving a health care benefit program, knowingly and willfully—
>
>     . . . .
>
> > (2) makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry,
>
> in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 5 years, or both.

---

[9] The Supreme Court in *Gaudin*, 515 U.S. at 512, and the Third Circuit in *McBane*, 433 F.3d at 345, were addressing 18 U.S.C. § 1001, which criminalizes materially false statements made to a federal agency, not 18 U.S.C. § 1035(a)(2), the statute under which defendant was convicted. Nevertheless, both the Supreme Court and the Third Circuit have applied this definition of materiality to numerous other federal statutes. *See United States v. Salko*, No. 1:07-0286, 2008 U.S. Dist. LEXIS 83480, at *7-8 n.2 (M.D. Pa. Oct. 20, 2008) (collecting cases). Furthermore, several district courts have employed this definition of materiality in the context of 18 U.S.C. § 1035. *See, e.g.*, *id.*; *United States v. Russell*, 808 F. Supp. 2d 309, 320-321 (D. Me. 2011).

18 U.S.C. § 1035(a)(2). The term "materially" immediately precedes and modifies "false, fictitious, or fraudulent," not "delivery of or payment for health care benefits, items, or services." Under the statute, the statement must be "materially false" and "in connection with the delivery of or payment for health care benefits"—the statement need not be material to the delivery of or payment for health-care benefits.

Nevertheless, I do agree that the falsehood must be "capable of influencing, the decision of the decisionmaking body to which it was addressed." *Gaudin*, 515 U.S. at 509. In this case, defendant was addressing agents of HHS and the FBI when he made false statements. (Nov. 3 Tr. at 37-38.) Those agents were investigating Tkach's August 24, 2009, application for reinstatement as a health-care-services provider under Medicare and Medicaid, in which Tkach certified that he was a shop manager and mechanic for Advantage Ambulance and that he had not submitted claims or caused claims to be submitted for reimbursement from Medicare for services furnished, ordered, or prescribed by him during his period of exclusion. (*Id*.) The agents were also investigating criminal wrongdoing by Tkach and Advantage Ambulance. (*Id*.) Additionally, Tkach remained an employee of Advantage Ambulance even after the Sivchuks sold the business. Given that defendant was vice president of Advantage Ambulance and the principal investor in the business, the jury could reasonably infer that his description of Tkach's role and responsibilities at Advantage Ambulance would be material to and capable of influencing HHS's decision as to whether to reinstate Tkach and whether to continue pursuing the criminal investigation.[10]

---

[10] Defendant argues that his "description of Mr. Tkach, whether as a mechanic, garage manager, shop manager or operations manager, was absolutely immaterial" because Francis testified that Tkach's exclusion did not prohibit him from working for Advantage Ambulance in

c.      **"In Connection With"**

Finally, defendant disputes the jury's finding that his false statement was made in connection with the delivery or payment for health-care benefits, items, or services. Although the Third Circuit does not appear to have interpreted the phrase "in connection with" in the context of section 1035, the court has addressed this statutory phrase in other contexts. The Third Circuit's discussion of the phrase in *United States v. Loney*, 219 F.3d 281 (3d Cir. 2000), albeit in the context of U.S.S.G. § 2K2.1(b)(5), is instructive. The court began by noting that "we should interpret undefined terms . . . in statutes[] using the terms' meaning in ordinary usage." *Id.* at 284. The court concluded that in ordinary usage, the phrase "in connection with" covers "a wide range of relationships" and should be read "broadly" and "expansively." *Id.*   Although the court "d[id] not attempt to provide an exhaustive list of relationships" encompassed by the phrase, the court did note that "'in connection with' expresses some relationship or association, one that can be satisfied in a number of ways such as a causal or logical relation." *Id.* Since the Third Circuit has applied this formulation of "in connection with" outside the section 2K2.1(b)(5) context, *see, e.g.*, *Artz v. Barnhart*, 330 F.3d 170, 176 (3d Cir. 2003) (applying the *Loney* definition of "in connection with" to 42 U.S.C. § 402(x)),  I will apply it to section 1035.

In a variation on his argument concerning materiality, defendant argues that his falsehoods were not made in connection with the delivery of or payment for health-care services

---

any of those capacities. (Def.'s Mem. at 10.) Although substantial evidence contradicts defendant's characterization of the testimony given by Francis, even accepting his version of the testimony, defendant's false statements would still be material to HHS's criminal investigation and evaluation of Tkach's application for reinstatement.

Because I conclude that there is ample evidence to support the jury's finding of materiality with respect to HHS, I need not reach defendant's argument that his false statements were immaterial to the Pennsylvania Department of Health Licensure.

because they "w[ere] clearly not made to secure payment for or delivery of any healthcare services" since the Sivchuks had already sold Advantage Ambulance. While a causal relationship may satisfy the "in connection with" requirement, it is only one of a "wide range of relationships" covered by the phrase.

Interpreting "in connection with" broadly, as the Third Circuit has instructed, and viewing the evidence and logical inferences in the light most favorable to the government, as I must in evaluating a Rule 29(c) motion, I conclude that there is sufficient evidence to support the jury's finding that defendant's statement was made in connection with the delivery of or payment for health-care benefits. Defendant made his statements directly to federal agents during the course of their investigation into whether Tkach or Advantage Ambulance had defrauded Medicare. (Nov. 3 Tr. at 38, 51.) His statements concerned the nature of Tkach's employment and what responsibilities he undertook during his employment with Advantage Ambulance, a company that delivered health-care services and was paid for health-care services. (*Id*. at 40-41, 59, 93, 115-16, 122.) Furthermore, the agents were investigating whether Tkach should be reinstated as a provider of health-care services, in other words, whether Tkach ought to be allowed to deliver health-care services and receive payment for health-care services. (*Id*. at 37-38.)

In *United States v. Bell*, 282 F. App'x 184, 188 (3d Cir. 2008) (not precedential), a case not unlike this one, the Third Circuit sustained a conviction under section 1035 for false statements that were made to officials during an investigation. Bell, an employee of a rehabilitation center that received Medicare and Medicaid funding, directed another employee to make a false statement to police during their investigation into the death of a patient. *Id*. at 186. That statement was ultimately turned over to the Department of Health. *Id*. at 188. Much like

18

defendant, Bell argued that the false statements were made "in relationship to the police investigation and had nothing to do with health care or a health care benefit program." *Id*. The Third Circuit rejected this argument, adopting instead the government's reasoning that the "'false statements at issue concerned health care services that had been provided to . . . [the patient] on the night of her death. Thus, the false statements were in fact made in connection with the delivery of health care services, as is required to sustain a conviction under § 1035(a)(2).'" *Id*.

In sum, I conclude that the defendant has not carried his heavy burden in challenging the sufficiency of the evidence supporting his conviction, and I will deny his motion for a judgment of acquittal.

### B.      Motion for a New Trial

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Defendant urges me to grant a new trial because the verdict is so contrary to the weight of the evidence that allowing it to stand would be a miscarriage of justice.[11]

"'Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case.'" *United States v. Silveus*, 542 F.3d 993, 1004 (3d

---

[11] Initially defendant moved for a new trial on the ground that "the variance between the conduct alleged in the Superseding Indictment and the Government's evidence [at] trial prejudiced the Defendant." (Mot. for J. of Acquittal and Mot. for New Trial ¶ 8.) However, defendant later conceded that "the defense was not surprised or prejudiced" by the government's evidence at trial, and thus appears to have abandoned this line of argument. (Def.'s Mem. at 14); *see also United States v. Castro*, 776 F.2d 1118, 1122 (3d Cir. 1985) ("Variances . . . only constitute reversible error in those cases where the variance prejudiced the defendant's defense.").

Cir. 2008) (quoting *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)). However, "[s]uch motions are not favored and should be granted sparingly and only in exceptional cases." *Id.* at 1005 (internal quotation marks and citations omitted). It is not enough that I believe a verdict to be against the weight of the evidence; I may order a new trial only if I believe that "there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *Id.* (internal quotation marks and citations omitted).

Exercising my own judgment in reviewing the evidence presented at trial, I find that the verdict was clearly not against the weight of the evidence. There was ample testimony that Tkach was the operational manager of Advantage Ambulance, (Tr. 114 at 72; Nov. 2 Tr. at 9, 36), and was responsible for transporting patients on occasion (Tr. 114 at 72, 132; Nov. 2 Tr. at 18, 41, 52); hiring and firing employees (Tr. 114 at 72, 129; Nov. 2 Tr. at 7, 34, 41); billing Medicare (Tr. 114. at 72, 134; Nov. 2 Tr. at 56); scheduling employees to transport Medicare patients (Tr. 114 at 72; Nov. 2 Tr. at 18, 36); handling patient complaints (Tr. 114 at 133-34); and handling employee disputes, discipline, and absences (Tr. 114 at 132-33; Nov. 2 Tr. at 18, 22, 43, 45). In my assessment, defendant was aware of these facts and had motive to conceal them from Fox News, the public, and most importantly, the agents who interviewed him. (Nov. 2 Tr. at 77-79, 82-86, 88-89.) Furthermore, the agents' testimony, although not without defects, credibly established that defendant misrepresented Tkach's position and duties. (Nov. 3 Tr. at 41, 59, 61, 63, 115-16, 122.) As I see it, these false statements concerned the delivery of and payment for health-care services  (*id*. at 37-38, 40-41, 59, 93, 115-16, 122) and were material to the HHS investigation (Nov. 3 Tr. at 37-38).

Upon review of this evidence, the cumulative effect of the testimony convinces me that

no miscarriage of justice has occurred. Therefore, I conclude that the interest of justice does not require that I grant defendant a new trial.

**III.    Conclusion**

For the reasons explained above, I will deny defendant's motion. An appropriate order follows.